## THE PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* JOHN C. STICKNEY, appellants, *v.* JOHN MARSHALL *et al.*, appellees.

### *Appeal from Sangamon.*

The Ordinance of Congress delegated to the Governor, Legislative Council, and House of Representatives of the Illinois Territory, ample power to grant the original charter of the Bank of Illinois. The legality of this charter has been recognized by various acts of the Legislature, and the reiterated action of other departments of the government for upwards of twenty years; the Constitution, also, by necessary implication, has recognized its validity.

The grant of the charter of the Bank of Illinois was a contract; its validity is acknowledged, and its inviolability guarantied. It is, as to this question, upon the same footing of other contracts; liable to be rescinded, or modified at the will of the contracting parties, but by no other authority.

By the twenty first section of the eighth article of the State Constitution, the Legislature is not to be considered as limited, either as to the number of branch banks, or the amount of banking capital they may be authorized to be employed in banking.

The extent of the constitutional inhibition upon the powers of the Legislature, upon the subject of banks, would seem to forbid the creation of any distinct and independent banks, except a State bank and its branches, and not an increase of capital or the number of branches.

The act of 1835 continues the existence of an old charter, but does not create a new charter. The charter derives its vitality from the first grant of the Legislature, and its extension is not a violation of the Constitution.

Every grant, or concession of power, carries with it, by necessary implication, all others essential to the efficient exercise of that granted.

The bank charters granted by the Territorial government were contracts, and as such are secure and inviolable under the provision of the Constitution of the United States.

The plain interpretation of the Constitution is, that there shall be no banks but those already in being, and a State bank, which the Legislature may establish. They may exist, subject to the control of the Legislature as to the period of their existence, the amount of their capital, and all other modifications compatible with their legal rights.

The powers of the Legislature must be considered plenary, unless restricted by clear and explicit language. This results from the well settled principle of constitutional law, that a State Constitution is a limitation upon, and not a grant of legislative power; that all legislative power is inherent in the Legislature, unless clearly withheld by the people in their organic law, or prohibited by the Constitution of the United States to the State.

When a law clearly and palpably violates the Constitution, the Court cannot look to the consequences of their decision; it is imperatively bound to declare it void. But the rule is well settled, that where the consequenses of a particular construction of a Constitution, or law, would render its operation mischievous, that construction should be avoided, provided it is susceptible of a different one.

The People *v.* Marshall *et al.*

It is well settled by the highest tribunals of the nation, that it is seldom, if ever, in a doubtful case, or upon slight implication, that the Court should declare the Legislature to have transcended its authority. The opposition between the law and the Constitution must be clear and strong, in the judgment of the Court, otherwise it cannot pronounce the law to be void.

Quo Warranto, upon the information of John C. Stickney, against the appellees, the President, Cashier, and Directors of the Bank of Illinois. The information was filed in the Sangamon Circuit Court, at the July term 1841, the Hon. Samuel H. Treat presiding. A plea was interposed, to which there was a demurrer, which was overruled, and judgment rendered thereon for the defendants.

The substance of the information and the plea is set forth in the Opinion of the Court.

*L. Trumbull,* for the appellants :

All the laws in question are invalid. The original charter, passed by the Territorial Legislature in 1816, is not, and never was, of any force or validity. All subsequent Acts of the Legislature of the State of Illinois, based upon the Act of 1816, are unconstitutional, and therefore null and void. Constitution of Illinois, Art. VIII., § 21; *State Bank* v. *The State*, 1 Blackf. 267.

The Ordinance of 1787 created a political corporation of limited and defined powers, and it must be governed by the rule laid down in the case of *The Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, as to the extent of the powers granted.

The Ordinance gave the Territorial Legislature no express authority to charter a bank, and it cannot be implied, unless it can be shown that a bank was incidental to the very existence of the Territory, or necessary for its good government. This cannot be shown.

What was the intention of the framers of the Constitution in inserting the provision in relation to banks? Certainly to guard against a multiplicity of banks; but if the construction contended for by the appellees is to prevail, that clause of the Constitution will have no meaning or effect whatever.

The Legislature, if their view is correct, might not only extend the charters of the territorial banks through all time, but they might go on adding to their capital, and increasing the number of branches, as they have done in this case, till there shall be a bank in every county in the State.

Again, the Acts of 1835 and 1837 make the Bank quite another and different institution from the one chartered in 1816. Its character is entirely changed, and the evil effects which the framers of the Constitution intended to guard against, have been produced.

If the Bank still exists, then by virtue of what law ? The Act of 1816 expired by limitation five years ago. If it exists at all, it must be by virtue of the Act of 1835; and if so, it is manifestly a new bank, created by a law passed in direct violation of that clause of the Constitution which inhibited the establishment of any bank, except a State Bank, which this is not pretended to be.

If the laws in question are repugnant to any of the provisions of the Constitution, the Court will not hesitate so to declare them, regardless of consequences.

*J. Lamborn*, Attorney General, on the same side:

The only question to be determined by this Court, is that of the constitutionality of the Acts of the State Legislature, of 1835 and 1837.

What is the proper interpretation of the clause in the Constitution referred to ? "There are three points to be considered in the construction of remedial statutes; the old law, the mischief and the remedy." 1 Black. Com. 87; 3 Term R. 7; Co. Litt. 11, 42; 1 Kent's Com. 463. The clause is a remedial one, and was intended as a restriction on the number of banks. By it, the Bank of Illinois was protected till January 1, 1837, and then its existence was to close. After that time, a State Bank and its branches were to form the monied institutions of Illinois.

"A corporation is a mere political institution, a creature of the legislature, having no other powers than what are given to it by its creator." 15 Johns. 358; 2 Cowen, 665, 678.

The following principles of interpretation should prevail in this case: "When we manifestly see what is the sense that agrees with the intention, it is not permitted to turn the words to a contrary meaning." Vattel, Book II. chap. 17, § 274, p. 230. "Every interpretation that leads to an absurdity, ought to be rejected." Grotius, Book II. chap. 16, § 6, p. 355. "The reason of the law, that is, the motive which led to the making of it, and the view there proposed, is one of the most certain means of establishing the true sense." Vattel, *supra,* § 287, p. 237; Grotius, *supra,* § 8, p. 355.

There are no terms more apt and appropriate to express the meaning of the framers of the Constitution, than those which were adopted. Their meaning is evident. They intended that the existing charters should expire by their own limitation, and that afterwards, there should be "no other banks or monied institutions in this State, except a State Bank and branches," &c.

*H. Eddy,* for the appellees:

The whole case depends on the constitutionality of the extension Act of 1835.

The framers of the Constitution intended that the *number* of banks should not be increased, except by a State Bank and its branches. There was no limitation upon the power of the Legislature to modify the then existing banks, with their consent; to extend their privileges; or to continue their existence beyond the times for which they were originally chartered, if it should be thought expedient to do so.

The State constitutions are *limitations* upon, and not *grants* of legislative power. The legislative power is regarded as inherent in every State Legislature, to every purpose whatever of legislative cognizance, except in so far as it may be positively restrained and limited by the people in their organic laws, (*Fletcher* v. *Peck,* 2 Peters' Cond. R. 317,) thus differing from the Federal Constitution, which is a mere grant of powers, legislative, as well as executive and judical, by the people or States.

The Act of 1835 was a constitutional enactment unless it

can be clearly shown that the clause in the Constitution, not only restrains the Legislature from increasing the number of the banks in the State, but restrains it also from adding to their usefulness, by conferring new privileges, or an enlarged capital, or prolonging their existence.

Conceding, for the sake of the argument, that the question of the validity of the Act of 1835 is a doubtful one, and we have failed to satisfy the Court of the positive constitutionality of the law; we may ask, on the other hand, if the opposite counsel have convinced the Court of its positive unconstitutionality? If they have not, it is one of doubt, and we then invoke the high authority of the Supreme Court of the United States, as conclusive in favor of the defendants. *Fletcher* v. *Peck*, 2 Peters' Cond. R. 317; see also, 1 Kent's Com. 426.

An argument, *ab inconvenienti,* might properly be addressed to the Court in this case, under all the circumstances.

*J. Shields,* in continuation :

The Court is called upon to declare the solemn act of the Legislature null and void. But Courts must be exceedingly cautious how they exercise the high prerogative of passing judgment upon the validity of the laws of the land. In a doubtful case, they are never warranted in interfering with the binding force of laws. 2 Peters, 522; 12 Wheaton, 270; 1 Blackf. 206; 19 Johns. 58; 11 Mass. 396; 2 Scam. 81, 82; *Eakin* v. *Rawle,* in 12 Sergeant & Rawle.

The General Legislature of the Union has only powers that are expressly granted; but the State Legislatures have all powers, except those expressly taken away. *The People* v. *Field,* 2 Scam. 79.

The Acts of the Legislature in 1835 and 1837 were mere *extensions* of the charters and privileges of the same institution. The Bank is not a *new* one, or other bank, but a mere continuance of the existence of one already created by law. *Lincoln & Kennebec Bank* v. *Richardson,* 1 Greenl. 79.

A State may revive a charter which has expired, and not thereby create a new institution. 17 Sergeant & Rawle, 64; Angell & Ames on Corp. 513; 16 Mass. 128; 4 Peters, 547, in

note. In the two latter cases, it is declared that a charter may be prolonged against the wishes of a bank, and such prolongation was held to be constitutional.

Whether the charter and existence of the Bank of Illinois be named or included in the constitutional provision or not, her rights and privileges would necessarily remain. 2 Mass. 146; 9 Wend. 351; 7 Peters, 14, 15; 7 Johns. 358.

Again, when a corporation has had a lawful existence, and rights have accrued thereby, Courts will presume the legality of its constitutional existence. 5 H. & J. 122; 12 Wheat. 71.

It was not the object of the framers of the Constitution to change or destroy the existing banking systems of the State, but to prevent the increase of petty banks.

The common understanding of the people is the best guide to an interpretation. The common mind attaches the truest meaning. The language of men must be construed by the understanding of men. This common understanding, respected by the judiciary, and acknowledged by every department of the government, is, that the Legislature of the State of Illinois had the same power of legislation in regard to the Bank of Illinois, as though the twenty first section of the eighth article of the Constitution had not been framed. *Polk* v. *Hill*, 2 Overton, 157.

*J. Butterfield*, in conclusion for the appellees:

It is contended, that the Act of 1816 was illegal and void, because the Ordinance of Congress did not authorize the Territory to charter a bank, which was not needful for the good government of the Territory; and because the Territory had power only to enact laws for the good and convenience of the people. It was for the Territory to judge what was "needful and convenient" for the people.

The admission of the State of Illinois into the Union did not vitiate the Acts of the Territorial Legislature. They remained valid; all rights, grants, privileges and charters were no more impaired under the Constitution, than the rights and grants of the Crown were affected by the revolution.

The Act of 1835, on its very face, purports to be a contin-

uance of an old charter, not the creation of a new one; and the distinction between enacting a new charter, and a revival or renewal of the same, is fully recognized by authorities. Dwarris on Statutes, 26, 29. The reason is, that whenever an old charter is about to be renewed, the former statute is the valid one, and it is sufficient to plead the former one without noticing the latter.

The new law derives force from the first Act. 3 Peters' Dig. 571. The suspension of a statute is not a repeal. Ib. 573. The intention of an Act, when discovered, must prevail, and this Court is called upon to gather that intention from the Act itself. 1 Peters' Dig. 606.

Whether the charter shall be considered as continued by the legislature, or as a new creation, is not to be learned from the stockholders, but from the terms of the old charter. *Lincoln & Kennebec Bank* v. *Richardson*, 1 Greenl. 79. "A statute may revive a bank charter, which has expired, without creating a new corporation, and the revived corporation may maintain a suit commenced after the passing of the reviving Act."

As to the Act of 1837, increasing the capital stock, &c. There is no limitation, express or implied, upon the power of the General Assembly to increase the capital stock of the Territorial banks, or to authorize branches.

*S. Strong,* for the appellants, in conclusion :

The Territorial Act of 1816 became, null and void as a charter, on the adoption of the Constitution. The twenty first section is restrictive in express terms, and its provisions are negative. The positive provision, if any, is the saving of the State Bank and branches, and permitting them to exist. But the true meaning of the section is to be ascertained by the first section of the schedule attached to the Constitution. Both annul and repeal the charter, but their "rights" are preserved.

The Legislature cannot revive Territorial Acts, but they must become void, unless continued by the Constitution, and the Act of 1816 was not so continued.

If, however, it did become a part of the Constitution, it was constitutionally determined in 1837, and the Legislature could no more touch, alter, or extend it, than they could change or alter any other feature of the Constitution.

Whenever a Legislature passes an Act, they may subse-·quently extend or perpetuate, revive or limit it, and the old Act must be pleaded. But any alteration of the *subject matter* of an Act makes it a new one, and the latter only is held to be in force. Bac. Abr., title *Statute*, D. 6, p. 638.

An amendatory statute, relative to the subject of previous ones, must be construed consistently thereto, as though the former were recited therein, and all were united in one. 4 Bac. Abr., letter J. § 3, 646–7.

The Opinion of the Court was delivered by

WILSON, C. J.   The judgment in this case was entered several terms since, but owing to the press of business and the want of time, no written opinion was then filed, and inasmuch as the Bank soon after went into liquidation under an Act of the Legislature, that seemed to preclude all future litigation in any way analagous to this, or in which this case could serve as a precedent, we could perceive no useful purpose that could be subserved by placing upon the record the reasons upon which our judgment was founded. But as it is now understood that the constitutionality of the Act of the Legislature adjudicated upon in this case may be drawn in question in the United States' Courts, we will, therefore, briefly state the points decided, without deeming it necessary to go into a full investigation of the grounds upon which our judgment was founded.

The case is here by appeal from the Circuit Court of Sangamon County. The proceedings are in the nature of *quo warranto*, upon the information of John C. Stickney against John Marshall and twenty one others. The information alleges that the defendants were, and are, exercising franchises not authorized by the Constitution and laws of this State, to wit, that said defendants have usurped the franchise of banking, &c., contrary to law, and then prays that said

defendants may be ousted, &c., of their franchises so illegally usurped and exercised, &c.

To this information, the defendants filed their plea, setting out an Act passed on the twenty eighth day of December, 1816, by the Territory of Illinois, entitled *An Act to incorporate the President*, &c., *of the Bank of Illinois at Shawneetown;* also, an Act of the State of Illinois, passed on the 12th day of February, 1835, entitled *An Act to extend for a limited time the Charter of the Bank of Illinois at Shawneetown;* and also an Act passed on the fourth day of March, 1837, entitled, *An act to increase the capital stock of certain Banks, and to provide means to pay the interest on a loan authorized,* &c. By said plea, the defendants asserted that the laws of Illinois authorized them to exercise the franchise as charged in the information, &c.

This plea was demurred to, the demurrer overruled, and judgment rendered for the defendants. From this judgment the Relator has appealed, and assigns for error this judgment, alleging those Acts set out in the plea to be unconstitutional.

The first ground assumed by the counsel for the Relator questions the legality of the original charter of the Bank granted in 1816 by the Territorial Government. This objection is altogether untenable. The Ordinance of Congress delegated to the Governor, Legislative Council and House of Representatives ample powers for this purpose. They were "authorized to make laws in all cases for the good government of the District." With regard to the policy of banks generally, it is not a question for our investigation, and with regard to the utility of this Bank, as a fiscal agent of the Government, or as furnishing a medium of exchange, although there may be a difference of opinion between the counsel and the authority that created the Bank, that cannot invalidate the legality of its charter. The utility and policy of the institution was referred by the Ordinance to the judgment of the Government of the Territory, and the charter it granted is an exponent of its opinion, upon this point, that is conclusive. It may also be observed, that the legality of this charter has been recognized by various Acts of the

Legislature, and the reiterated action of other departments of the Government for upwards of twenty years. And, in addition to this evidence in its favor, it is expressly recognized by the Constitution, in terms which, if not understood as direct confirmation, must be understood as such by necessary implication. They clearly indicate the sense of the Convention as to its legal existence, and its intention that it shall be continued. This constitutional sanction of the Bank, we think, must put to rest all question in relation to its legality. But the Convention did not make it a part of the organic law of the land, so as to place it out of the power of the Legislature to change or modify it with the consent of the corporators, as has been insisted. It only amounts to a continuance, by that solemn act, of the charter, with the powers contained in the original grant. The argument would be quite as plausible to say, that all contracts are a part of the Constitution; because it declares their validity shall not be impaired by law. Just so with regard to the Bank; the grant of the charter was a contract; its validity is acknowledged, and its inviolability guarantied. It is, as to this question, upon the same footing of other contracts, liable to be rescinded or modified at the will of the contracting parties, but by no other authority. The idea of a Constitution, subject to such change and fluctuation, is so much at variance with acknowledged principles and universal opinion, as not to be entertained for a moment.

The next objection to the exercise of the franchises claimed by the defendants, is founded upon the eighth article of the twenty first section of the Constitution, which declares "that there shall be no other Banks or monied institutions in this State, but those already provided by law, except a State Bank and its branches, which may be established and regulated by the General Assembly of the State, as they may think proper." Under this provision, it is insisted that the Act of 1835, passed prior to the expiration of the Charter of the Bank of Illinois at Shawneetown, and by which it was extended for twenty years, and the Act of 1837, by which the capital stock was increased, and authority given to establish

branches, are both unconstitutional; that by this provision, the powers of the Legislature are limited to the creation of a State Bank and branches, and that to permit it to extend the charter of the Bank of Illinois, with authority to establish branches, would defeat the intention of the Convention, which, it is insisted, was to limit the number of banks to be established to a State Bank and branches.

These are the positions assumed by the Counsel for the Relator; but from the fact, that a State Bank alone could be made as prolific in branches as it, and all the other banks together, it must be apparent that the reasoning is fallacious. Let it be conceded, that by continuing the existence of one or more of the Territorial banks, with permission to establish branches, that the number might be made equal to that of all the counties in the State; but is it not equally true, that the State Bank alone might be permitted to establish an equal number of branch banks. In no view of the subject, therefore, can the Legislature be considered as limited; either as to the number of branch banks, or the amount of banking capital they may authorize to be employed in banking. The extent of the constitutional inhibition upon the powers of the Legislature, would seem to be, to forbid any new creation of distinct and independent banks, except a State Bank and its branches.

This construction of the Constitution is warranted, not only by its language, but also by a consideration of the evils we may suppose its authors intended to guard against. By reference to the history of the country, just before and about the time of the adoption of the Constitution, it will be seen, that it was overwhelmed with independent banks, most of them insolvent, or daily expected to become so, and as a necessary consequence, the paper of almost all of them greatly depreciated. These evils were in the mind of the Convention, and admonished it to guard against their recurrence in future. How was this evil to he averted? The idea of dispensing with banks altogether was entertained by few, if any, of the statesmen of that time, and when the probable increase of population, wealth, trade, and general prosperity of the State was

taken into consideration, no prescience of mind could fix exact limits to the amount of banking, or banking capital, that the exigencies of time and circumstances, might render expedient or necessary. Upon this point, therefore, the Convention had to trust to the wisdom and discretion of the Legislature. But no such obstacle interposed to prevent a constitutional limitation to the number of distinct and independent banks, and this was the prevailing mischief. The declaration, therefore, that there shall be no other banks but those provided by law, and a State Bank and branches, &c., was designed to guard against the incorporation of these independent banks. But two of the territorial banks were then in operation, and there is nothing to rebut the inference, that it was intended to be left to the discretion of the Legislature to determine what number should be allowed to expire at the end of their charters, or be continued with such modifications as time and the light of experience might dictate.

By limiting the number of independent banks, the great mischief of a currency of unequal value is diminished in the same ratio, and so, too, the danger of individual loss from insolvency will be proportionably diminished, as a knowledge of their condition will be the more easily obtained. The acknowledged intention of the Constitution was to forbid any new creation of banks, except a State Bank, &c., and in accordance with this restriction, it is to be observed that the Act of 1835 purports to be a continuation of an old charter, and is such in fact. The distinction between a new charter, and the renewal of an old one, is fully recognized by authority. The continuance of an old charter is not the creation of a new corporation, and it is said that in pleading, the latter Act need not be noticed, the vitality and authority of the corporation being derived from the former one. This principle sanctions the renewal of the Bank of Illinois, and to suppose the Convention acted in ignorance of it, would be a gratuitous and unwarrantable presumption. The extension of the charter as to time alone, is no violation of the Constitution, but, it is also said that enlargement of its capital, &c., is such. This is an assumption, however, that is not borne out by the

terms of the Constitution itself. No restriction is to be found in that instrument, either as to the renewal of the charter of the Bank, or other enlargement, or the modification of its powers, and authority being established in the Legislature to continue the charter of the Bank, that of modification, so as make it conform to, and suit the ever-varying exigencies of time and circumstances, would follow as a matter of course, upon the principle that every grant, or concession of power, carries with it, by necessary implication, all others essential to the efficient exercise of that granted.

There are no extraneous circumstances in any way connected with the adoption of the Constitution, from which it can be inferred that the convention intended to impose a restriction upon the power of the Legislature, beyond that which may be understood from a fair and common sense interpretation of its language. Prior to the Convention, the Territorial Government had granted four bank charters, two of them, that of the Bank of Illinois and the Bank of Edwardsville, had gone into operation. These charters were contracts, and as such secure and inviolable under the provision of the Constitution of the United States. It was not merely for the purpose of ratifying them, therefore, that the Convention declared, "that there shall be no other Banks, or monied institutions in the State but those provided by law, except a State bank and branches, which may be established by the Legislature," &c. By thus naming the Banks then in being, in connection with the one authorized to be established, places them all upon the same footing, and excepts them all out of the operation of the restriction imposed upon the power of the Legislature, as the creation of other banks than those designated. This is the grammatical construction, and common sense meaning of the language, as well as the legal effect. Supposing the Convention had wished to preserve the judicial system as then organized, and for that purpose had said, there shall be no other Courts, or tribunals of justice in the State, but those already provided by law, except a Supreme Court, which may be established and regulated by the legislature, &c. Could it for a moment be contended

that the authority of the legislature was limited by this language, to the establishment of a Supreme Court, and that all power, not only to continue the existence of the Courts then in being, but also all authority to enlarge and regulate their powers and duties, so as more effectually to enable them to answer the purposes of their creation, was denied the legislature? Certainly not, and if so, how can the authority of the legislature be considered limited except in relation to the establishment of new banks; for there is a strict analogy between the case supposed, and the one under consideration. The plain interpretation of the Constitution is, that there shall be no banks but those already in being, and a State bank, which the legislature may establish. They may exist subject to the control of the legislature as to the period of their existence, the amount of their capital, and all other modifications compatible with their legal rights.

If the exercise of this power was intended to be inhibited, it is difficult to conceive why it was not forbidden in explicit terms. It is not pretended to be thus forbid, and as the subject is one of legislative cognizance, the powers of the Legislature must be considered plenary, unless restricted by clear and explicit language. This results from the well settled principle of constitutional law, that a State Constitution is a limitation upon, and not a grant of legislative power; that all legislative power is inherent in the Legislature, unless clearly withheld by the people in their organic law, or prohibited by the Constitution of the United States to the State. Corporations are legitimate subjects of legislative cognizance. The extension of the charter of the Bank of Illinois must, therefore, be clearly inhibited by some constitutional provision, or the power to do so, is possessed by the Legislature. No express inhibition can be shown, but it is sought to be inferred from the twenty first section of the eighth article of the Constitution. But even if it was competent to restrict the Legislature in the exercise of a legitimate authority, by mere inference and presumption, yet there is no rule of construction by which such inference can be drawn from the language of this provision of the Constitution.

With the knowledge, on the part of the Convention, that the Legislature would possess the power of renewing and enlarging the charters of the Territorial banks, unless expressly taken from them, is it not a fair presumption that they would have said that the charters of those banks shall not be renewed, or their powers enlarged, or used some other terms that would clearly express that intention, if in fact such intention was entertained. No such language, however, is used, but on the contrary that which is employed implies the absence, if not the reverse of such intention. It is declared that there shall be no other banks but those already provided by law, of which the Bank of Illinois was one, except a State Bank, &c., which may be established by the Legislature. This provision recognizes the banks then in existence, and permits their continuance, without giving or taking from the Legislature any authority over the subject. The declaration that there shall be no other banks but those provided by law, is in effect an affirmation that they may be, that they are not forbid, but there shall be no others, except a State Bank. The Legislature may bring into being one more bank, but that is the extent of their powers as to new creations. As to those already in being, however, and the one permitted to be brought into being, there is no restriction, and we may infer that they are only mentioned in order to except them out of the limitation imposed upon the power of the Legislature, in reference to the creation of other banks. In speaking of them in this connection, it will be observed that no terms of negation are applied either to them, or the authority of the Legislature over them. The only prohibition to the power of the Legislature is acknowledged to be the declaration that there shall be no other banks, &c. Suppose the Legislature had imagined that the Territorial banks were sufficient, and had said that there shall be no other banks or monied institutions in the State, but those provided by law, no one could understand this as intending to forbid the Legislature to renew the charters of those banks, for that would be to leave the State altogether without such an institution, after the charters of those in existence had expired, and such a result was certainly not contem-

The People v. Marshall et al.

plated. A policy like this, is of more recent origin in this country than the adoption of our Constitution. If this language, then, which is identically that of the Constitution, so far as relates to the Territorial banks, would not prevent the Legislature from continuing them, how can the additional exception in favor of a State bank, which follows, have that effect, without ascribing to that combination of words a magical influence altogether different from their ordinary meaning.

We have been earnestly admonished not to look to the consequences, which are to result from a decision against the constitutionality of the law under consideration. When a law clearly and palpably violates the Constitution, the Court can look no farther ; it is bound to declare it void without regard to consequences. But in a case that admits of doubt, and when, as in this case, the principal arguments are drawn from historical reminiscences, and the impolicy of banking corporations generally, the views of the Court ought not to be so restricted as to exclude all considerations of the consequences of a decision against the validity of the law, particularly when their character and magnitude are such as must follow a decision of this case. Here is an institution bearing the imposing name of the Bank of Illinois, which has been in operation and in good credit for years, and under the sanction of a law of the State, inviting and holding out inducements to the investment of capital from abroad and at home, and upon the faith of which, capital to a large amount has been invested by individuals, and by the State to the amount of a million. In addition to which, notes to probably an equal or greater amount have been put in circulation by the Bank, and are now in the hands of innocent holders, who are in no way connected with the institution. This, together with all the capital stock paid in by individuals and by the State will be lost, without any fault on the part of the sufferers, but simply because of the confidence they reposed in a public law of the State. Nor is this all. Under these circumstances, it could not be expected that the State would escape the imputation of bad faith, when it is believed that most of the capital paid in on stock is from abroad, while

all the loans of the Bank have been made to citizens. The mag-
nitude and pernicious character of these results are sufficient-
ly obvious without any remarks. They are such as the Court
cannot, and ought not to close its eyes to, neither should they
be allowed to exercise an influence further than they are
calculated to illustrate the intention and true construction of
the Constitution. Thus far they are entitled to weight, for
the rule is well established, that where the consequences of
a particular construction of a Constitution or law would
render its operation mischievous, that construction should
be avoided, provided it is susceptible of a different one.

A recurrence to consequences, however, is not necessary.
The application of one principle to this case, when it is con-
sidered in one aspect in which it presents itself, leaves no
question as to the duty of the Court. The Constitution has
prescribed to each department of the government its appro-
priate duties and sphere of action, and it is devoutly to be
wished that each one should keep within its proper sphere,
without venturing upon the exercise of doubtful authority.
By acting upon this safe and salutary rule, all conflict of
jurisdiction, and all question of authority would be avoided,
and still leave ample scope for useful action to each depart-
ment. But a departure from this rule by the Legislature
can furnish no apology to the Court for a like practice. It
does not necessarily follow that a law which, as legislators,
we might decline voting for, because of prudential doubts,
we ought, as a Court, to declare void. The degree of oppo-
sition between the law and the Constitution should govern the
determination of the Court. When the conviction of their
incompatibility is clear and strong, the duty of the Court
becomes equally so. It should declare the law to be void.
But it has been repeatedly decided, and is well settled by
the highest tribunals in the nation, that it is seldom, if ever,
in a doubtful case, or upon slight implication, that the Court
should declare the Legislature to have transcended its
authority. Upon this principle, then, aside from all other
considerations, we are constrained to say, that we cannot
declare the law under consideration to be a violation of the
Constitution. After allowing to the able and ingenious

The People *v.* Marshall *et al.*

arguments of the counsel of the Relator the utmost weight they are entitled to, and they only prove that the Constitution is somewhat obscure and ambiguous in its phraseology, that it does not expressly confer upon the Legislature the power of renewing the charters of the then existing banks, and consequently the most that can be claimed is, that the passage of the law for that purpose was the exercise of a barely doubtful power on the part of the Legislature. It is not, however, in a doubtful case, as has been said, that the Court is warranted in declaring an act of the Legislature unconstitutional. The principle which should govern the decision of the Court in such a case is clearly and concisely expressed by Chief Justice Marshall, in giving the opinion in the case of *Fletcher* v. *Peck*, 2 Peters' Cond. R. 317. It is there said by the Court, that "the question whether a law be void for its repugnancy to the Constitution is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The Court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligation which that station imposes. But it is not on slight implication and vague conjecture, that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered void." The opposition between the law and the Constitution must be clear and strong, in the judgment of the Court, otherwise it cannot pronounce the law to be void. That opposition does not exist in this case. There is not that incompatibility between the Constitution and the law under which the defendants below claim to exercise the franchise of banking, as to justify the Court in pronouncing the law unconstitutional and void.

The judgment is therefore affirmed.*

Justices BREESE and DOUGLASS dissented from the Opinion of the Court.

*Judgment affirmed.*

---

*This case was decided at the December term 1841, but no opinion was delivered until the present term.